UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **SOUTH LOUISIANA ETHANOL, LLC** | **09-12676** |
| | SECTION A |
| DEBTOR | |
| | CHAPTER 11 |

### REASONS FOR DECISION

On February 15, 2011, the Motion for Recognition of Administrative Expense[1] ("Motion") filed by CRGTWO, Inc. ("CRG") came before the Court. At the conclusion of the hearing, the Court took the matter under advisement.

### Facts

In 2006, South Louisiana Ethanol, L.L.C. ("SLE") began the construction and refurbishment of a production facility in Belle Chasse, Louisiana. In connection with its project, it contracted with Benchmark Design USA, Inc. ("Benchmark") for the fabrication and refurbishment of industrial equipment. On August 8, 2007, Benchmark and SLE entered into an Equipment Reconditioning Agreement.[2]

Benchmark operations were conducted in part from a facility located in Plant City, Florida. The facility was leased from CRG under a Lease Agreement dated February 1, 2007 ("Plant City Lease").[3] The leased space included a 42,351 square foot covered manufacturing facility and use of an outside storage yard. Benchmark leased the property for a term of three (3) years ending on January 31, 2010. From August 25, 2009, through January 31, 2010, Benchmark was charged a

---

[1] P-159.

[2] POC 15-1

[3] Exh 1.

monthly rental of $12,493.55 based on an annual price per square foot of $3.54.[4] In addition, Benchmark was charged for water and electrical usage as well as a portion of the insurance, property taxes, and ordinary maintenance incurred on the property.[5]

The Plant City property is composed of several separate manufacturing and storage units, an office building, and a large storage yard. A total of 181,332 leasable square feet, including 162,901 square feet of manufacturing space, comprises the entire area. CRG has owned the Plant City property since 1997, and it has never been fully occupied.

Benchmark defaulted under the Plant City Lease in August 2008. Despite Benchmark's failure to make any rental payments under the lease from August 2008 until January 2010, CRG allowed Benchmark to remain on the premises and operate its business. When the lease terminated on January 31, 2010, Benchmark abandoned the facility. CRG immediately padlocked the property and filed suit in Florida State Court to collect past due rent on March 5, 2010.[6]

In connection with its State Court suit, CRG requested that a Writ of Distress be issued seizing all property of Benchmark located on the Plant City leasehold.[7] Benchmark answered CRG's complaint on April 10, 2010, alleging in part that some of the property remaining at the leasehold was not owned by Benchmark but third parties, including SLE.[8] CRG was aware of

---

[4] Benchmark was not charged additional rent for use of the storage yard.

[5] Insurance, maintenance and property tax charges were prorated based on the leasable square footage on the property.

[6] Exh. 5.

[7] Exh. 6.

[8] Exh. 7. The Answer described several pieces of property owned by Industra Services, Inc., Tropicana Foods, Garry Edwards, or SLE.

SLE's bankruptcy filing and had even reviewed its docket some months earlier, but CRG did not immediately contact SLE regarding Benchmark's allegations.[9]

On May 19, 2010, Benchmark advised SLE that CRG had seized Benchmark's property at located at the Plant City facility.[10] It also indicated that some of SLE's property might have been included in the seizure. On May 20, 2010, Emile Turner, counsel for SLE wrote to CRG and its state court counsel to advise that SLE was in bankruptcy and the automatic stay prohibited the seizure and sale of its assets.[11]

In early June 2010, Whitney National Bank's ("Whitney") counsel contacted CRG regarding the equipment still located at the Plant City facility. Whitney holds an alleged security interest in all of SLE's movable property.[12]

Also in early June 2010, CRG hired Mr. Kent Aguillard as bankruptcy counsel to represent it in connection with the property claimed by SLE. Mr. Aguillard filed the instant Motion for Administrative Expense on August 12, 2010 in SLE's bankruptcy case.[13] The Motion requested administrative rents and damages for use of the Plant City leasehold. The initial hearing on the Motion was held on September 22, 2010. As a result of the hearing, SLE was ordered to inventory the estate property located at the Plant City facility.

---

[9] Exh.7. Mengel testified that he had personally examined SLE's bankruptcy docket in October 2010 because he knew SLE was a customer of Benchmark.

[10] Exh. 19.

[11] Exh. 20.

[12] Exh. 38.

[13] P-159.

Following the initial hearing, SLE hired John Crabtree to remove its equipment. On October 16, 2010, Crabtree; Kennett Stewart of SLE; Alan Mengel, CRG's president; and Gary Martin, an employee of CRG, met to discuss the logistics for removing the equipment. Crabtree removed sixteen (16) pumps from the facility on that same day.

On November 8, 2010, Crabtree returned to Plant City with two (2) helpers to remove SLE's equipment. The parties agree that five (5) pieces of equipment were left at the facility after November 9, 2010: a furnace component, fines framework, a throat suction box, and two (2) furnace dryers. Two (2) of the pieces were located inside the manufacturing facility and the remaining three (3) in the outside yard. In December 2010, Stewart received a call from Kent Aguillard demanding removal of the remaining five (5) items. Stewart had the remaining items removed on January 4, 2011.

In June 2010, CRG listed the Benchmark leasehold for rent with Edward Miller for a price of $3.50 per square foot. Robert Riggins, Whitney's expert, agreed that $3.50 per annum per foot was a reasonable price in the present market for the Plant City space.[14] However, the experts diverged in their views as to how much space should be attributed to SLE's benefit. The SLE equipment occupied a total square footage of 11,285. The market for industrial property in the leasehold area is at 96% occupancy. No calls, inquiries, or offers to lease any of the Benchmark leasehold had been received by Miller as of the trial date.

**Law and Analysis**

11 U.S.C. § 503 provides that on timely request for payment of an administrative expense, the court may award administrative status to a claim for the actual, necessary costs and expenses of

---

[14] Exh. 25, 36.

preserving the estate. CRG avers that SLE's equipment was located on its property from August 25, 2009, until January 4, 2011. It further argues that the storage of SLE's equipment was of benefit to the estate because it preserved the property. As a result, CRG has alleged an administrative expense claim equal to the rents and other charges due but unpaid by Benchmark from August 25, 2009, through January 31, 2010. In addition, CRG asserts a claim for market rent and estimated costs from February 1, 2010, until the final removal of all SLE equipment on January 4, 2011. CRG's claims after January 31, 2010, are based on its experience under the Plant City Lease.

SLE does not deny that some compensation is due CRG for the storage of SLE's equipment. However, SLE argues that it is not responsible for occupancy charges during the term of Benchmark's possession nor is it responsible for rent of the entire area formerly occupied by Benchmark after January 31, 2010.

A creditor's claim is entitled to administrative priority, as an "actual and necessary" cost of preserving the estate, only if the cost benefitted the estate and its creditors.[15] The requirement that an expense must have benefitted the estate in order to qualify for administrative priority has no independent basis in the Bankruptcy Code, but is instead a way of testing whether a particular expense was truly necessary to the estate. If the expense was of no benefit, it cannot have been "necessary."[16]

---

[15] *Matter of H.L.S. Energy Co., Inc.,* 151 F.3d 434, 437 (5th Cir. 1998); *Matter of DP Partners, Ltd. Partnership,* 106 F.3d 667, 672 (5th Cir. 1997), cert. denied, *DP Partners, Ltd. Partnership v. Hall Financial Group, Inc.,* 118 S.Ct.63, 139 L.Ed.2d 26 (1997), appeal after remand, 1998 WL 241243 (N.D.Tex. 1998); *Matter of TransAmerican Natural Gas Corp*, 978 F.2d 1409, 1416 (5th Cir. 1992), reh'g denied, 983 F.2d 1060 (5th Cir. 1993), cert. dismissed, *Matter of TransAmerican Natural Gas Corp v. Toma Steel Supply, Inc.,* 113 S.Ct. 1982, 507 U.S. 1048, 123 L.Ed.2d 646 (1993).

[16] *Matter of H.L.S. Energy Co., Inc.,* 151 F.3d at 437, *supra* note 18.

Consideration of an administrative expense request involves balancing two (2) competing principles: ratable distribution among claimants and a desire to encourage vendors to conduct business with a debtor. For this reason the courts are given a great deal of discretion in determining an administrative expense claim.[17]

An administrative priority is given to postpetition vendors as an inducement to engage in business transactions with a debtor's estate.[18] It is also rooted in the principle that creditors must pay the expenses necessary to produce distributions attained for their benefit.[19]

However, the Bankruptcy Code also favors ratable distribution among all unsecured claimants. To keep administrative expenses to a minimum, administrative expense requests are construed strictly and narrowly.[20] A claim is not entitled to administrative priority status simply because it arises postpetition.[21]

The burden is on the creditor to prove its entitlement to administrative expense priority.[22]

> A prima facie case under § 503 may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as

---

[17] *Matter of DP Partners, Ltd. Partnership,* 106 F.3d at 673-674; *In re Chester County Plastics, Inc.*, 174 B.R. 41, 44 (Bankr. E.D. Pa. 1994).

[18] *Matter of TransAmerican Natural Gas Corp*, 978 F.2d at 1420, *supra* note 18.

[19] *Matter of H.L.S. Energy Co., Inc.,* 151 F.3d at 437, *supra* notes 18 and 19.

[20] *NL Industries, Inc. v. GHR Energy Corp.,* 940 F.2d 957, 966 (5th Cir. 1991); *Nat'l Union Fire Ins. Co. v. VP Bldgs, Inc.*, 606 F.3d 835, 838 (6th Cir. 2010); *In re Das A. Borden & Co.,* 131 F.3d 1459 (11th Cir. 1997), *reh'g denied; In re Larsen,* 59 F.3d 783, 786 (8th Cir. 1995); *In re Electronica, Inc.*, 995 F.2d 320 (1st. Cir. 1993).

[21] *In re Great Northeastern Lumber & Millwork Corp.,* 64 B.R. 426 (Bankr. E.D. Pa. 1986).

[22] *Matter of TransAmerican Natural Gas Corp*, 978 F.2d at 1416, *supra* note 18.

a going concern.[23]

Because the claim arises from a transaction between CRG and Benchmark, not SLE, CRG has not made a prima facie case and bears the full burden of proof.

CRG's request for an administrative expense can be divided into two (2) parts. The first portion of the request involves rents and charges owed by Benchmark under the Plant City Lease but unpaid. Although Benchmark went into default in August 2008, CRG seeks only those rents and charges accruing after SLE filed for relief on August 25, 2009, through the term of Benchmark's lease on January 31, 2010.

Generally, administrative claims qualify for priority status only if the services were supplied to the debtor-in-possession in the operation of its business.[24] In this case, CRG requests administrative status for charges Benchmark incurred in connection with its business operations. The evidence presented at trial established that despite Benchmark's failure to make any payments on the Plant City Lease after August 2008, CRG allowed Benchmark to remain on the leased premises and continue to conduct business operations. Mengel testified that he hoped Benchmark would be able to satisfy CRG's claims if it could complete the work it had under contract. For this reason, he allowed Benchmark to continue to occupy the leasehold.

Under CRG's theory of recovery, because Benchmark was working on SLE contracts, which included the refurbishment and fabrication of SLE equipment located on site, SLE benefitted from Benchmark's continued occupancy of the Plant City facility. For this reason, SLE should be required to reimburse CRG for the costs of that occupancy.

---

[23] *Id.*

[24] *In re La Electronica, Inc.,* 995 F.2d 320, 322 (1st Cir. 1993).

SLE was not a tenant nor was it ever in privity with CRG. Benchmark leased from CRG, and Benchmark defaulted on its lease. SLE has no responsibility for CRG's business decision to leave Benchmark in place after default. Benchmark was entitled to possession of the entire leasehold space until CRG terminated its rights, Benchmark used the leasehold space in part to store and work on the equipment of SLE and others, and Benchmark vacated the premises on January 31, 2010. Occupancy during the term of the Plant City Lease was to Benchmark, not SLE. Neither potential or derivative benefit to the estate, nor mere possession will satisfy the Bankruptcy Code's requirements for administrative expense designation.[25]

The Court cannot conceive of a legal or equitable theory that supports CRG's demand that SLE pay the rents and charges owed by Benchmark. There is no connection between Benchmark and SLE that would obligate SLE for Benchmark's debts. To hold that by virtue of Benchmark's work for SLE that SLE is now responsible for all of Benchmark's operating expenses on a theory of "benefit" would be to hold every debtor responsible for the obligations of its vendors. The law does not support such relief. CRG's claim for amounts accrued under the Plant City Lease are, therefore, denied.

The second part of CRG's claim is for rents and charges incurred from February 1, 2010, through January 4, 2011. CRG alleges that during this period, SLE equipment remained on its property. As a result, CRG seeks payment of rents for approximately 42,000 square feet of space previously occupied by Benchmark. In addition, it claims amounts for insurance, property taxes, utilities, and maintenance based on the total square footage occupied.

---

[25] *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994).

Benchmark operated its business from multiple locations. Although SLE was aware that Benchmark had a business facility in Plant City, prior to May 19, 2010, it was unaware that Benchmark leased the facility or that in January 2010 it abandoned the location. Further, SLE did not know what, if any, SLE equipment was being held by Benchmark and where that equipment was located. At the time SLE filed for bankruptcy relief, it owed substantial sums to Benchmark under its contract. The contract was incomplete having been halted in late 2008. Until Benchmark advised SLE on May 19, 2010, that its equipment might be under a seizure taken by CRG, SLE had no reason to know that its equipment was being "stored" by a third party.

On the other hand, as early as March 2010, Benchmark advised CRG that equipment belonging to SLE might be located on CRG's property. This possibility was again confirmed when Benchmark formally answered CRG's state court complaint in April 2010. In addition, CRG was aware as early as August 2008 that Benchmark was fabricating equipment for SLE, and CRG believed SLE owed Benchmark substantial sums under that contract. CRG also knew that SLE was in bankruptcy and in October 2009, even reviewed its docket on line. Despite this knowledge and the ready availability of counsel, CRG made no effort to contact SLE or notify it that SLE's equipment was allegedly on its property.

On May 20, 2010, SLE placed CRG on formal notice that it had filed bankruptcy and that some of its property might be located on CRG's leasehold. In early June 2010, Whitney's counsel contacted CRG regarding the SLE equipment located at the Plant City facility. In an email to CRG, Whitney identified the SLE equipment it believed was located at the Plant City location and requested that CRG identify any storage costs that might be due. The email was followed with a call

9

to CRG.[26] Following notification by SLE, CRG made no request for removal of SLE's equipment until its formal demand in August 2010.

Since SLE was unaware of the equipment's location or the potential for storage charges, it was not on notice of a potential claim by CRG until May 19, 2010. Ultimately, SLE removed all estate equipment from the CRG site by January 4, 2011, but had it been advised earlier of CRG's claims, the property could have been removed sooner. Therefore, while these expenses might qualify as actual, they were never necessary.[27] As a result, the Court finds that the additional rent claimed by CRG for the period of February 1, 2010, through May 19, 2010, constitute an unnecessary expense that was avoidable.

Following the filing of CRG's Motion for Recognition of Administrative Expense,[28] an initial hearing was held on September 22, 2010.[29] SLE was ordered to inventory the estate property located at the Plant City facility and determine if it would be removed or remain. SLE visited the Plant City facility on October 16, 2010, and discussed removal of the equipment with CRG.

Crabtree and Stewart testified that during the October 16, 2010, visit, he, Stewart, Mengel and Martin discussed the logistics of removing SLE's equipment. In connection with these discussions, they also broached leaving the furnace component 60M dryer, the fines cyclones rack, and the suction box throat on site. According to Crabtree, the cost to move these items was in excess

---

[26] Exh. 38.

[27] *In re Express One International, Inc.*, 217 B.R. 207, 211 (Bankr.E.D. Tex. 1998).

[28] P-159.

[29] P-203.

of their value, and he suggested leaving them for Martin to cut up for scrap. According to Crabtree and Stewart, both believed that this was acceptable to Mengel.

On November 8, 2010, Crabtree returned to Plant City with two helpers to remove SLE's equipment. It was at that time that Crabtree asked Martin if Martin could also scrap the 60 M dryer furnaces located in the yard. Martin agreed and the items were left along with those previously discussed. Crabtree testified that Mengel was not present during this conversation.

Five (5) pieces of equipment were left at the facility after November 9, 2010: a furnace component, fines framework, a suction box throat, and two furnace dryers. Two (2) of the pieces were located inside the manufacturing facility and the remaining three (3) in the outside yard. In December 2010, Stewart received a call from Kent Aguillard demanding removal of the remaining five (5) items left for scrap. According to Stewart, after SLE removed the majority of its equipment in November, Mengel determined that the cost to scrap the items was more that he could recover. As a result, he wanted the items removed by SLE. Stewart testified that rather than press the point, he had the remaining items removed for scrap on January 4, 2011.

A debtor's occupancy of leased space may entitle the landlord to a claim for the fair market value of the property "*actually used*."[30] When a debtor only uses a portion of the leasehold, it must pay an administrative expense only for that portion.[31] While payment of rent for use and occupancy of real estate ordinarily counts as "actual and necessary," because bankruptcy proceedings are equitable, a landlord's right to collect monetary relief is somewhat curtailed. The debtor is generally

---

[30] *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1285 (5th Cir. 1986) (emphasis added).

[31] *In re Thompson*, 788 F.2d 560 (9th Cir. 1986).

11

required to pay only the reasonable value for use and occupancy of landlord's property which may or may not equal the amount agreed upon under the terms of a lease.[32]

From May 19, 2010, forward, CRG is entitled to a fair rental for the storage of SLE's equipment. CRG again argues that base rent, common area maintenance charges, sales taxes, and utilities are due based on the entire 42,000 square feet Benchmark formerly occupied. SLE argues that its equipment only occupied a portion of that space, and therefore, it should only pay a proportionate amount of rent. CRG counters that SLE's occupancy prohibited lease of the entire Benchmark leasehold space. Therefore, its loss was for the entire rent not just the portion actually occupied by SLE's equipment.

In June 2010, CRG listed the Benchmark leasehold for rent with Edward Miller, an industrial broker. In connection with the property's listing, Miller prepared marketing materials including an aerial view of the entire facility and details regarding its amenities.[33]

Miller admitted that this property had never been fully occupied in its thirteen (13) years of ownership by CRG even though the surrounding area enjoys a 96% occupancy rate. For example, Benchmark was the only tenant in the property in 2009 and in 2010, only 67,000 square feet had been leased in an adjacent building to the subject space for a short six (6) month term.[34] Despite Miller's efforts, he also admitted that he had received no calls, no inquiries, and no offers to lease any of the Benchmark leasehold. Miller explained that the property was special and required a specific tenant. Thus, despite high occupancy rates for the area, this property remained vacant.

---

[32] *Zagata Fabricators, Inc. v. Superior Air Products*, 893 F.2d 624, 627 (3rd Cir. 1990).

[33] Exh 28.

[34] Exh 12. Approximately 9,000 square feet of office space was also placed under contract along with the majority of the storage yard in 2010.

Both Miller and Whitney's expert, Robert Riggins, agreed that $3.50 per annum per square foot was a reasonable price in the present market for the Plant City space.[35] The question presented was the *amount* of space that should be attributed to SLE's benefit.

Prior to the removal of SLE's equipment, Riggins visited the facility and measured the space that each piece occupied. Whitney offered into evidence Riggins' schematic which located each piece and measured the surrounding area it occupied. According to Riggins, the equipment occupied a total square footage of 11,285. Alternatively, Riggins presented an "efficient storage" estimate of 6,876 square feet, assuming the equipment was marshaled in close proximity. Finally, Riggins also presented an outside storage rental of .45 per square foot. To each of Riggins' estimates were added costs of insurance and property taxes.

The Court agrees with CRG that storage facilities are typically rented based on total square footage available rather than the portion of footage actually utilized by a tenant. However, in this case SLE is not, nor was it ever, CRG's tenant. It's equipment arrived and remained on CRG's property without knowledge of Benchmark's lease. Given that CRG was neither presented with nor missed any opportunity to lease the entirety of this space, CRG cannot justify charging SLE the entire market rent for space its equipment did not occupy. CRG was not harmed by the presence of SLE's equipment, nor was it denied enjoyment of possession because CRG failed to establish that it was prohibited from leasing the entire 42,000 square feet formerly occupied by Benchmark as a result of the presence of SLE's equipment. A rental based on the actual space occupied by SLE's equipment is both supported by the jurisprudence and equitable under the circumstances. This

---

[35] Exh. 25, 36.

13

results in a monthly rental rate of $3,291.46 based on SLE's occupancy of 11,285 square feet of rental space.[36]

In so finding, the Court rejects SLE's argument that either its "efficient storage" or outside storage methods be utilized in determining fair compensation. The record reflects that neither Whitney nor SLE gave CRG permission to move the equipment to an outside location. While CRG could have requested permission to do so, it was not CRG's responsibility to assume that the property could be moved without permission. CRG's expressed concern that the property might be damaged in a move or by the elements was credible. It was incumbent upon SLE to seek alternative methods of storage in May 2010, when SLE first learned of this issue. Instead, both SLE and Whitney waited until a Motion for Administrative Claim was filed to actually investigate the options available.

Both Whitney's and CRG's experts agreed that shared charges for insurance, property taxes, and maintenance should be added to the per foot rental rate. In addition, actual utility expenses should be recouped. According to copies of insurance premium statements, CRG paid $56,781.09 in insurance per year. Given a total leasable square footage of 181,332, SLE's pro rata share would be 6%, $3,533.70 per year, or $294.48 per month.

CRG submitted copies of its property tax assessments for proration.[37] Taxes for 2009 totaled $49,787.74. Based on 181,332 of leasable square feet, the 11,285 occupied by SLE's property would incur a charge of $258.21 per month.[38] CRG also submitted a list of actual maintenance

---

[36] 11,285 sq. ft x ($3.50/12) = $3,291.46..

[37] Exh. 46.

[38] (($49,787.74/181,332) x 11,285) / 12 = $258.21.

14

expenses for the first six (6) months of 2010, averaging $949.91 per month.[39] SLE's share of these expenses, extrapolated from actual charges, would be 6% or $57.00 per month.[40]

Current utility bills were not supplied by CRG at trial. Instead, CRG provided utility statements for water and electricity incurred during Benchmark's occupancy, when Benchmark was operating a fabricating business on site. Despite having separate meters for electrical, CRG neglected to provide any statements for electrical or water services after January 2010. Mengel admitted that electrical charges would be minimal given that after January 2010 no one operated or utilized the space in which the SLE's equipment was stored. For this reason, the Court finds that CRG has failed to carry its burden of proof regarding the actual utility charges incurred for the space proratable to SLE.

Based on the above, CRG is entitled to an administrative expense of $3,901.15 per month[41] or $31,209.20 for the eight (8) months SLE equipment was on site.

CRG included in its pretrial brief[42] a request for "costs of prosecution" of its Motion. CRG distinguishes *In re Jack/Wade Drilling, Inc.*[43] and alleges that it is entitled to recover its costs of prosecution because unsecured creditors will recover nothing regardless.[44] *Jack/Wade* cites the

---

[39] Exh. 41. $5,699.46/ 6 = $949.91.

[40] $949.91 x 6% = $57.00.

[41] $3,291.46 + $57.00 + $294.48 + $258.21 = $3,901.15.

[42] P-382.

[43] *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385 (5th Cir. 2001).

[44] P-382, p. 11.

15

exception in *Reading Co. v. Brown*[45] which holds "damages resulting from the negligence of a receiver acting within the scope of his authority as a receiver give rise to 'actual and necessary costs.'" *Reading* does not apply in this case. SLE has not committed negligence and negligence has never been asserted. Therefore, the Court denies CRG's request for costs of prosecution.

## Conclusion

CRG is entitled to a total administrative expense of $31,209.20. The Court will render a separate Order in accord with these Reasons.

New Orleans, Louisiana, March 16, 2011.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[45] *Reading Co. v. Brown*, 391 U.S. 471, 485, 88 S.Ct. 1759, 1767 (1968).